**UNITED STATES of America**

v.

**Stanley SANDERS, Appellant.**

**No. 07–1737.**

United States Court of Appeals, Third Circuit.

Submitted Under Third Circuit LAR 34.1(a) April 18, 2008.

Filed: April 22, 2008.

Nancy B. Winter, Office of United States Attorney, Philadelphia, PA, for United States of America.

---

Robert Epstein, Defender Association of Philadelphia Federal Court Division, Philadelphia, PA, for Appellant.

Before: SLOVITER, JORDAN, and ALARCON,* Circuit Judges.

## OPINION OF THE COURT

JORDAN, Circuit Judge.

Stanley Sanders was convicted in the United States District Court for the Eastern District of Pennsylvania of two counts of bank robbery in violation of 18 U.S.C. § 2113(a). He timely filed the present appeal, challenging, first, the District Court's denial of his pretrial motion to suppress out-of-court identifications made pursuant to an allegedly suggestive photo array; second, the Court's overruling of his objections to an allegedly prejudicial remark by the prosecutor during closing argument; and, third, the validity of his sentence in light of what the government has acknowledged was a mistake in the calculation of his criminal history score. We will affirm the conviction, vacate the sentence, and remand for resentencing.

## I. Background

The robberies that Sanders was convicted of committing occurred in January and February of 2006. According to testimony from the trial, which was evidently accepted by the jury, on January 11, 2006, Sanders got into a teller line at the Sovereign Bank branch at 2000 Market Street in Philadelphia, Pennsylvania. One of the bank tellers, Christopher Stone, told Sanders he was entering the line at the wrong end. Sanders did not go to the end of the line but instead waited for Stone to finish with a customer. Sanders then walked up to Stone and handed him a note, which read, "100s, 50s only. No dye packs. No

alarm. No one hurt. Don't do anything until I leave." (Appendix ["App."] at 362.) Fingerprint analysis subsequently showed that the note had been handled by Sanders. After Stone read the note, he asked Sanders "if this was for real" and Sanders said, "yeah." (App. at 358.) In keeping with the training he had received, Stone made a point of studying Sanders's face. Stone gave Sanders money and then watched through the bank's windows as Sanders left the bank and walked around the corner. Immediately after the robbery, Stone gave the police a detailed description of the robber. Shortly thereafter, the police had Stone look at a suspect they had detained, and Stone told them they had the wrong man.

On February 1, 2006, Sanders entered the Citizens Bank branch at 2001 Market Street in Philadelphia. He waited in line, then approached teller Alexandra Scott and handed her a note. It read, "20s plus 10s. No alarms. No dye packs. No one hurt. Don't do anything until I leave." (App. at 395.) Like Stone, Scott had received training on how to respond during a robbery. She studied Sanders's face and hands as she put money in an envelope and handed it to him. After the robbery, she gave police a detailed description of the robber, including mention of a scar by the thumb of his right hand.

Given the similarity in the descriptions provided by the two tellers, and the nearly identical language in the demand notes, law enforcement agents concluded that the robberies were committed by the same person. Bank surveillance photographs from the second robbery were particularly clear, one of them even showing the scar on the robber's hand. Agents thus decided to publish one of those photographs in a

* Honorable Arthur L. Alarcon, Senior Circuit Judge of the Ninth Circuit Court of Appeals sitting by designation.

newspaper and to request the public's assistance in identifying the robber. A woman named Nancy Kincaid saw the photograph in the newspaper and immediately recognized the robber as Sanders, whom she had seen weekly during the course of the previous year at a veterans center where she worked. She contacted the FBI and provided information that led agents to confirm with one of Sanders's prior employers, Aluminum Shapes, that Sanders had a scar on his right hand. Some of Kincaid's co-workers at the veterans center and supervisors from Aluminum Shapes also identified Sanders from bank surveillance photographs.

Agents next obtained a close-up picture of Sanders from a computer database and, using that and pictures of other men, created a photo array from which the victim tellers identified Sanders. Sanders was arrested for the robberies and, following his failed attempt to suppress the tellers' out-of-court identifications, he was tried and convicted.

## II. Discussion [1]

As earlier noted, we are presented with three arguments on appeal: first, that the defense motion to suppress should have been granted because the photo array was unduly suggestive; second, that the prosecutor made an improper comment during closing arguments; and, third, that the District Court miscalculated the advisory sentence to which Sanders was exposed under the United States Sentencing Guidelines.

### A. The Out–of–Court Identifications

Sanders's argument against the admission of the pretrial identifications focuses on the photo array that the FBI constructed and the manner in which the array was introduced to the tellers. The array itself includes a facial shot of Sanders, showing him from just above the top of the shoulders to the top of his head. From the photograph, it appears, though one cannot be certain, that he is not wearing a shirt. The agents assembled that photograph with seven other photographs of men who, like Sanders, are African–American and have beards. Sanders is shown in the upper left-hand corner of a two row display, with four photos in each row. Before displaying the array to Stone and Scott, the victim tellers, agents spoke to each of them separately, showed them the bank surveillance photographs, and discussed the robbery that each had experienced. Stone and Scott were told that the robber may or may not be in the array and were further told not to pick out a

---

1. The District Court had jurisdiction pursuant to 18 U.S.C. § 3231; we exercise jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

We review the District Court's decision to admit evidence, including identification evidence, for "abuse of discretion, applying clear error review to its underlying factual findings and plenary review to its conclusions drawn from such facts." *United States v. Mathis*, 264 F.3d 321, 331 (3d Cir.2001).

As to the District Court's decision to overrule defense counsel's objection to the prosecutor's comment during closing argument, we review for abuse of discretion. *United States v. Brennan*, 326 F.3d 176, 182 (3d Cir.2003) ("We review the District Court's ruling on any contemporaneous objections [to the prosecution's closing remarks] for abuse of discretion.").

Finally, because the defendant did not raise before the District Court his argument about a miscalculation under the Guidelines, we review that argument for plain error. *United States v. Wood*, 486 F.3d 781, 790 (3d Cir. 2007). "Under the plain error standard, a reviewing court may reverse an order or judgment of the district court 'only if [it] find[s] that (1) an error was committed; (2) the error was plain, that is, it is 'clear' and 'obvious;' and (3) the error 'affected [the defendant's] substantial rights'.'" *Id.* at 790 n. 6 (citations omitted).

photograph unless they were sure it depicted the robber. Both immediately and positively identified the photograph of Sanders as a depiction of the man who robbed them.

At the pretrial suppression hearing, the District Court denied Sanders's motion to suppress, saying,

> there was no intrusion on Mr. Sanders' due process rights here.... The array is not unnecessarily suggestive; in fact, I think it could be said that it's not at all suggestive and, even if it were, it's fairly clear based on the testimony of the two witnesses that there was no risk of any misidentification here at all because of their clearly explained opportunities to observe and the degree of attention ... which they both gave the robber.... They appear to have been accurate, they certainly expressed no uncertainty at all in terms of the identifications that they made.

(App. at 118–19.)

We agree with the District Court. We have a two-step process for determining whether an out-of-court identification must be excluded:

> The first question is whether the initial identification procedure was 'unnecessarily' ... suggestive. This inquiry ... contains two component parts: that concerning the suggestiveness of the identification, and that concerning whether there was some good reason for the failure to resort to less suggestive procedures. If a procedure is found ... unnecessarily suggestive, the next question is whether the procedure ... gave rise to such a 'substantial likelihood of ... misidentification' that admitting the identification would be a denial of due process.

*Mathis,* 264 F.3d at 330 (alterations in original) (quoting *United States v. Stevens,* 935 F.2d 1380, 1389 (3d Cir.1991)). Here, the inquiry ends with the first step, since

neither the array itself nor the manner in which it was presented to the witnesses was unnecessarily suggestive.

Sanders complains that eight photos were too few to be fair, that his photo was in too prominent a position within the array, and that his photo stood out because he was the only one not wearing a shirt. None of those complaints, either singly or in combination, leads us to believe the array was unnecessarily suggestive. The defendant cites no evidence or authority for the proposition that eight photographs are too few to be fair. *Cf. United States v. Lawrence,* 349 F.3d 109, 115 (3d Cir.2003) (six photo array not unduly suggestive). Nor do we believe that the placement of his photo in the upper left-hand corner of the array would suggest it should be selected. Likewise, we are not prepared to say that there is any logical connection between being bare-chested and being guilty. Each photo shows a man with unique characteristics. That does not make unduly suggestive the characteristics unique to Sanders's photo. *See Reese v. Fulcomer,* 946 F.2d 247, 260 (3d Cir.1991), *superseded on other grounds by statute,* 28 U.S.C. § 2254(d) ("[P]hotographic displays have been held not unduly suggestive even when certain characteristics of the defendant or his photograph are set apart from others.").

The assertion that the procedure employed in displaying the array was impermissible is also unpersuasive. We are satisfied that, even if the defense is correct in asserting that discussion of the robberies and display of the bank surveillance photographs were problematic (and we do not need in this case to decide whether that assertion is correct), the totality of the circumstances militates against a holding that the procedure employed was unduly suggestive. The agent who displayed the array showed all of the pictures at once, *cf.*

*Lawrence,* 349 F.3d at 115 ("[I]t appears to us that showing all of the photographs at once can be a very fair way to proceed depending on all circumstances surrounding the identification."), and he specifically advised the victim tellers that the array might not contain the picture of the perpetrator.

Finally, we should note that, even if there were something unnecessarily suggestive in the array or the procedure employed in displaying it, Sanders has not carried his burden of showing that there was "such a 'substantial likelihood of ... misidentification' that admitting the identification[s][was] a denial of due process." *Mathis,* 264 F.3d at 331 (citation omitted). The District Court did not err in concluding that each teller's out-of-court identification of Sanders was reliable, especially given each teller's opportunity to observe Sanders during the robbery, the degree of attention each paid, the accuracy of their descriptions, and the level of certainty each displayed in identifying Sanders.

*B. The Prosecutor's Rebuttal Argument*

■ In closing argument, defense counsel used an analogy to explain the concept of reasonable doubt. He asked the jurors to think of themselves contemplating a medical operation that would forever change their lives, that might in fact be fatal. If the jurors thought they would "hesitate and pause" before deciding whether to proceed, they would be experiencing a reasonable doubt, he said. (App. at 649–50.) Not surprisingly, the prosecutor, in rebuttal, sought to blunt the effect of that pause-before-you-die hypothetical. She said the burden of proof "is not be-

yond all doubt, it's reasonable doubt, the level of doubt beyond which everyone has ever been convicted in Federal court." (App. at 654–55.) At that point, defense counsel said, "objection" and the Court responded, "overruled." Nothing more was said about the prosecutor's statement. The Court gave a standard instruction on the meaning of "reasonable doubt," and no exceptions were taken to the charge.

Because of the somewhat awkward concluding clause of the quoted sentence from the prosecution's rebuttal, Sanders argues that the standard of reasonable doubt was hopelessly compromised in this case[2] and that the government introduced extra-record information about other convictions. Merely to state the argument, however, is to see it as out of proportion to the infraction, if infraction it was. The prosecutor's rebuttal would surely have been better if she had not mentioned "everyone [who] has ever been convicted in Federal court." But that brief stumble was entirely innocuous, both in intent and effect.

The prosecutor's pointing out that "reasonable doubt" is not an impossible standard did not denigrate the standard's importance. The rebuttal argument can fairly be viewed as nothing more than an innocent and acceptable effort to respond to the somewhat extreme hypothetical posed by the defense. The contention that extra-record information about other convictions was put before the jury is even less persuasive. No reasonable juror could have thought that the government was urging that Sanders be convicted because other people, throughout history, have also been convicted of crimes. There was no prosecutorial misconduct here, and

---

2. More specifically, Sanders argues that the prosecutor's statement constitutes misconduct that diluted the requirement of proof beyond a reasonable doubt and that, therefore, the error is "structural" and "requires reversal without reference to the harmless error doctrine." (Appellant's Br. at 29, citing *Sullivan v. Louisiana,* 508 U.S. 275, 279, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993).)

there was no prejudice. *Cf. United States v. Brown,* 254 F.3d 454, 465 (3d Cir.2001) ("As a general rule, in assessing whether an ambiguous prosecutorial remark should be construed as an improper comment ..., appellate courts should not strain to reach the one interpretation which ascribes improper motives to the prosecutor." (internal quotation marks and citation omitted)).

### C. The Miscalculation of the Guidelines Range

■ Both parties agree that the District Court erred in calculating the applicable Guidelines range. Sanders argues, and the government does not dispute, that the presentence report erroneously assigned a criminal history point for a conviction that should not have been counted because the sentence associated with it was imposed more than ten years before the offenses for which Sanders was convicted in this case. *See* U.S.S.G. § 4A1.2(e)(2) & (3) ("Any other prior sentence that was imposed within ten years of the defendant's commencement of the instant offense is counted.... Any prior sentence not within the time periods specified above is not counted."). The District Court followed the Guidelines miscalculation set forth in the presentence report, which meant that Sanders was assigned to Criminal History Category VI when he should have been in Category V. This affected his advisory sentencing range under the Guidelines, and there is no indication of what the sentence would have been but for the error. We must therefore remand for resentencing. *See United States v. Langford,* 516 F.3d 205, 216 (3d Cir.2008) (holding that a miscalculation of the Guidelines range constitutes harmful error unless the record "show[s] that the sentencing judge would have imposed the same sentence under a correct Guidelines range").

### III. Conclusion

Accordingly, we will affirm the defendant's conviction but remand for resentencing, to include a corrected calculation of the advisory sentencing range under the Guidelines.